## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| RYAN MUN, individually and on behalf of all others similarly situated, | **Case No.** |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| POPEYES LOUISIANA KITCHEN, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff, Ryan Mun ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Defendant, Popeyes Louisiana Kitchen, Inc. ("Defendant" or "Popeyes"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.     Federal courts have repeatedly recognized that undisclosed digital tracking undermines fundamental privacy interests. Unauthorized collection of browsing activity, site interactions, and device identifiers invades reasonable expectations of privacy online. The harm is magnified where a company affirmatively represents that users can limit or disable tracking, yet secretly continues data transmission. That practice deprives users of meaningful control over their personal information and constitutes a serious privacy violation.

2.     Popeyes Louisiana Kitchen, Inc. operates a commercial website, https://www.popeyes.com/ (the "Website"), through which users browse menus, locate restaurants, customize orders, and explore promotional offers. Like many modern websites, the Website displays a cookie banner and a "cookie preferences" interface (the "cookie settings")

purporting to give users meaningful control over what data the Website shares with third parties. The banner assures users that they may control the sale or sharing of their personal information and may decline all non-essential cookies.



This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. Select Cookie Settings for more information. By accessing or continuing to use our site, you agree to our **Terms of Service** and our **Privacy Policy**, which may impact certain important rights.

**Cookie Settings**

*Figure 1 – Cookie Banner of Popeyes representing users could change tracking behavior through cookie settings*

3.      Defendant's assurances are false. Cookie-consent interfaces are deceptive and legally actionable where a website (1) begins placing and transmitting third-party tracking tools (the "Tracking Tools") before users have the ability to interact with the cookie banner, and (2) continues transmitting user data to advertising and analytics companies (the "Tracking Entities") even after users toggle off the sale/sharing of personal information and reject all non-essential cookies. *See Pemberton v. Rest. Brands Int'l, Inc.,* No. 25-cv-03647-JSC, 2025 U.S. Dist. LEXIS 230964 (N.D. Cal. Nov. 24, 2025). These practices plausibly constitute invasion of privacy, intrusion upon seclusion, and fraud. Furthermore, misrepresenting the effectiveness of a cookie opt-out mechanism deprives users of control over their personal information and creates a concrete injury sufficient for Article III standing.

4.      From the moment of access, and until at least December 2025, the Website initiates data collection through various tracking technologies, well before the user can view or act upon the cookie banner. Until December 2025, even after users affirmatively toggle off the sale/sharing of personal information and reject all non-required cookies, the Website continues to deploy and

transmit data via Tracking Tools to the Tracking Entities. Upon information and belief, these Tracking Entities include Google, Meta (also referred to as "Facebook"), and additional advertising technology partners whose Tracking Tools, including cookies, track users' browsing history, Website interactions, inputs, device information, session data, and unique identifiers across the Website.

5.      To summarize, until December 2025, the site's consent management tools provided a deceptive representation of how visitor data was actually handled and commercialized. By maintaining an interface that promises privacy while secretly facilitating live tracking by external entities, the Defendant creates a misleading environment of security. This practice effectively strips individuals of their autonomy over their personal information, a dynamic identified by the *Pemberton* court as a significant infringement on user control.

6.      Plaintiff visited the Website, most recently in or around 2025, to browse menu items and locate nearby Popeyes restaurants. Plaintiff clicked "Cookie Settings," toggled off the sale/sharing of personal information, declined all non-necessary cookies, and selected "Confirm My Choices." In reliance on Defendant's representations, Plaintiff believed that the Website would honor these choices. Until December 2025, however, Defendant continued to transmit Plaintiff's browsing activity, page interactions, navigation patterns, and identifiers to the Tracking Entities for advertising and analytics purposes.

7.      Defendant's conduct allowed the Tracking Entities to unlawfully intrude into Plaintiff's Sensitive Information, private communications, invade Plaintiff's fundamental right to privacy, and fraudulently misrepresented the Website's data-collection practices. In doing so, Defendant violated California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device); Florida

Security of Communications Act § 934.01 and § 934.31 (unlawful use of a pen register or trap and trace device); as well as common-law prohibitions against invasion of privacy, intrusion upon seclusion, fraud and deceit, unjust enrichment, and related statutory and common-law protections. Plaintiff brings this action on behalf of himself and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices. As of December 2025, the banners were configured to correctly deactivate tracking.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Defendant has the principal place of business located in this District.

9.      This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintain its principal place of business in this District.

10.      Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

11.      Plaintiff Ryan Mun is a resident and citizen of California who accessed Defendant's Website for its intended purposes, including browsing menu offerings, locating restaurant locations, and reviewing promotional content. Plaintiff was physically located in California at all relevant times. On or about March 4, 2025, Plaintiff accessed the Website using his ordinary

devices and browser and encountered the Website's default tracking configuration. Upon access, Tracking Tools intercepted and recorded Plaintiff's browsing activity and device identifiers contemporaneously with page load, notwithstanding the presence of a cookie banner representing that tracking would not continue absent consent.

12.     As part of the investigation conducted in preparation for this Complaint, the Website was revisited on December 2, 2025 on Plaintiff's behalf and the cookie banner opt-out was exercised by declining all non-essential cookies. Despite that selection, the Website continued to deploy Tracking Tools and transmit user data to Tracking Entities, including data reflecting browsing activity and device identifiers, as confirmed through review of network activity associated with those test visits.

13.     During a subsequent review conducted shortly before filing, and following a discussion with counsel, Plaintiff personally accessed the Website again and observed that, as of December 31, 2025, the cookie banner appeared operational. Plaintiff cannot determine whether this condition reflects a permanent remediation, a temporary modification, or a browser-specific configuration. Any subsequent change does not cure Defendant's prior violations and does not affect Defendant's liability for the conduct alleged herein.

14.     Defendant Popeyes Louisiana Kitchen, Inc. ("Popeyes") is a corporation engaged in the business of operating, franchising, and marketing quick-service restaurants throughout the United States. Popeyes operates and maintains the official Popeyes website, through which consumers are encouraged to browse menu items, locate restaurants, engage with promotions, and initiate online orders. Popeyes is incorporated under the laws of the State of Minnesota and maintains its principal place of business in Miami, Florida, United States. Popeyes' operations are supported by its parent company, Restaurant Brands International, which oversees administrative,

operational, technological, and marketing services for multiple restaurant brands, including Popeyes.

## FACTUAL ALLEGATIONS

### I.   How Websites Function

15.     Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

16.     Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

17.     Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

18.     When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

19.     An IP address is "a unique address that identifies a device on the internet or a local network."[4] Essentially, an IP address is:

---

[1] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Dec. 22, 2025).
[2] *Id.*
[3] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Dec. 22, 2025).
[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Dec. 22, 2025).

The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

20.     When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response (the "HTTP Response"), which includes the status of the request and, typically, a copy of the Request URL and the user's requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[5]

21.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

22.     The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[6] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters*[7]

23.     Website owners or web developers write and manage the URLs for their websites.

24.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[8]

---

[5] *Id.*
[6] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).
[7] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Dec. 22, 2025).
[8] *Id.*

For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

25.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[9] Today, UTF-8 is the Internet's most common character encoding.[10]

26.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[11] To demonstrate:



*Figure 3 – Demonstrating URL encoding and decoding*[12]

27.     Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[9] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Dec. 22, 2025).
[10] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Dec. 22, 2025).
[11] *What is URL Decoding and URL Encoding?*, GOCHYU (Oct., 2020), https://gochyu.com/blog/url-encode-decode (last visited Dec. 22, 2025).
[12] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Dec. 22, 2025).



*Figure 4 – Screen capture as of Dec. 30, 2025, of the Popeyes online ordering webpage depicting a sample webpage used to demonstrate a webpage URL*



*Figure 5 – Screen capture as of Dec. 31, 2025, depicting the request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 4)*



*Figure 6 – Screen capture as of Dec. 31, 2025, depicting a decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

28.    After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code that of the webpage, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[13]   This is the visible, and usually interactable, website that most people think of.

29.    To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[14]

30.    Such complex tasks include streaming videos by Users or subscribing to Newsletters/ Digital Magazine, or code used to monitor and report user activity.

---

[13] *What is a URL?*, Mozilla, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Dec. 22, 2025).
[14] *See JavaScript Basics*, Mozilla, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Dec. 22, 2024).

31.     In short, the Internet relies on a constant back and forth stream of requests.

32.     Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests that make up their experience on the Website.

## II.     Defendant Programmed the Website to Include Cookies

33.     The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and third parties to identify the device making the request and to record a session reflecting how the user interacts with the Website.

34.     First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

35.     Third-party cookies are placed by domains other than the Website's domain, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third parties' scripts determine whether their cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow third parties to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

36.     As detailed further below, third-party cookies that are placed on users' devices during interactions with the Website are used to intercept and record users' communications for the Tracking Entities, enabling them to surreptitiously track and collect Website users' personal information and sensitive information in real time. This includes, but is not limited to, information reflecting users' browsing and visit activity, such as webpages viewed, URLs, titles, keywords, time spent on pages, navigation paths, and the frequency and recency of visits to the Website, as well as session-level details including timestamps, duration, and actions taken during Website visits, and referring URLs identifying the website or platform directing the user to the Website.

37.     This tracking further captures detailed interaction and behavioral data, including links, buttons, forms, and other on-page elements selected by users, information entered into search fields, forms, and order interfaces, including location data and preferences, items viewed, customized, or added to carts, and inferred interests, preferences, age, location, or characteristics derived from user behavior and content engagement. In addition, the information collected includes device and technical identifiers such as device type, operating system, browser type, and related identifiers, persistent user identifiers enabling recognition of users across sessions and websites, and approximate geolocation data derived from IP addresses or other signals. Collectively, this information is referred to herein as "Sensitive Information."

38.     Cookies serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, cookies enable Defendant and its partners to enhance revenue and marketing effectiveness through the collection, analysis, and dissemination of user data.

39.     Defendant owns and operates the Website, which allows users to browse Popeyes's menu offerings, locate restaurants, explore promotions, and place orders for pickup or delivery. When users interact with the Website by navigating pages, clicking links, entering data, or customizing orders, they transmit Sensitive Information directly to Defendant.

40.     When users visit the Website, both first-party and third-party cookies are placed on their devices and/or transmitted to third-party servers. Because Defendant controls the Website's software code and determines which third-party resources are loaded, Defendant has complete control over whether these cookies are placed and whether user data is transmitted to third parties.

41.     Defendant explains its use of third-party cookies on the Website's cookie consent and preference interface by stating, in substance, that it may use personal information for targeted advertising and may share personal information with third parties as defined by applicable privacy laws.

42.     The cookie preferences interface further represents that "targeting cookies" are used to understand user behavior across websites and to show advertisements tailored to users' interests, and that information collected through such cookies may be shared with advertising platforms to display relevant messages.

> "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. Select Cookie Settings for more information. By accessing or continuing to use our site, you agree to our Terms Of Service and our Privacy Policy, which may impact certain important rights."[15]

43.     Defendant provides additional disclosures regarding its use of third-party cookies in their Privacy Policy. In the section addressing "Internet-Based Advertisements," Defendant

---

[15] Popeyes' cookie consent preference window, as it was available when Plaintiff opted out of cookies and tracking technologies on the Website.

informs users that certain third parties providing advertising services may collect or receive information about users' interactions with the Website through cookies and similar technologies, and that such information may be combined with data collected across different websites to deliver more relevant advertising.

> "We may use third parties to serve advertisements on our Services and on other websites and digital platforms. We may also use services provided by vendors to serve targeted ads to you and others on such platforms. You can manage your preferences regarding the sharing of Personal Information tied to your Account. Please note that even if you opt out of interest-based advertising, tracking technologies may still collect data for other purposes including analytics, personalization, and improving the Services, and you will still see ads from us, but the ads will not be interest-based ads."[16]

44.     In the section addressing 'Cookies and Beacons,' Defendant further explains that it and third parties may use cookies, web beacons, pixels, or similar technologies to measure marketing effectiveness, deliver targeted advertising, and customize users' online experiences, including across websites and digital platforms.

> "We and other companies that provide advertising and other services on our Services may use cookies and beacons to facilitate administration and navigation, to better understand and improve our Services, to determine and improve the advertising shown to you here or elsewhere, and to provide you with a customized online experience."[17]

## III.  Defendant Falsely Informed Users That They Could Opt Out of the Website's Use of Cookies

45.     When users located in California visited the Website, the Website immediately displayed a pop-up cookie consent banner. The banner informed users that the Website "uses cookies" and that information about users' interactions with the Website is shared with social

---

[16] *Privacy Policy*, POPEYES, https://www.popeyes.com/privacy-policy (last visited Dec. 30, 2025).
[17] *Id.*

media, advertising, and analytics partners. The banner further presented users with the option to accept cookies or to manage their "Cookie Settings."



*Figure 7 – Cookie Banner of Popeyes representing a "cookie preferences" interface to accept or manage' cookie settings"*

46.     Website users who selected the "Cookie Settings" option were presented with a cookie consent preferences window, which represented that users could control how their personal information was collected, used, sold, or shared by adjusting toggles related to targeted advertising, selling, or sharing of personal information, consistent with applicable law.

47.     Upon expanding the section addressing the sale or sharing of personal information and targeted advertising, Defendant represented to users, in substance, that they could exercise their right to opt out of the sale or sharing of personal information by using the toggle switch, and that if users opted out, Defendant would not provide personalized advertising and would not hand over users' personal information to third parties.



*Figure 8 – Screen capture as of Dec. 30, 2025, depicting Cookie Settings option representing users with an option of disabling the selling of user information and targeted advertising*

48.     To begin with, Popeyes misleads users by labeling the system as an "opt-in" to targeted advertising—in reality, the Tracking Tools are activated by default, and the system is designed as an "opt-out."



*Figure 9 - Screen capture as of Dec. 30, 2025, depicting the automatically enabled tracking system*

49.     Defendant also provides additional details in its cookie pop-up, noting that "targeting cookies" and "performance cookies" would be deactivated by disabling targeted advertising. The pop-up provides a cookie list of related targeting cookies, which notes that _ga_xxxxx_ and _gat_gtag_xxxxx tags (first-party Google-based targeting cookies), _gid_ (first-party Google-based performance tag), and _ga (first-party Google cookie placed by Defendant), are affected by this decision.



*Figure 10 - Screen capture as of Dec. 30, 2025, depicting the Cookie details link and associated list of cookies affected by deactivating "targeting" cookies on 'Defendant's Website*

50.     Missing from the Cookies Details list (and a similar list discussing "necessary" cookies) is any mention of __Secure-3PAPISID, __Secure-3PSID, __Secure-3PSIDT (Google targeting cookies).

51.     After users moved the toggle to indicate their choice to disable the sale or sharing of their personal information and to decline all non-essential cookies other than those strictly necessary and clicked "Confirm My Choices," users were permitted to continue browsing the Website. At that point, the cookie banner and the cookie settings window disappeared.

52.     Defendant's cookie banner and cookie settings led Plaintiff, and all Website users similarly situated, to believe that they had successfully disabled the sale or sharing of their information and all non-essential cookies. The banner and preference window further reasonably led users to believe that Defendant would not allow third parties, through cookies or similar

technologies, to access users' Sensitive Information with the Website including their browsing history, visit history, Website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—after users exercised their control over disabling the Tracking Tools.

53.     These representations were false. In reality, Defendant did not abide by users' expressed preferences. When users moved the toggles to opt out of the sale or sharing of their personal information and to reject all non-essential cookies, they clearly communicated that they did not consent to the placement or transmission of Tracking Tools, including non-essential cookies. Nevertheless, Defendant continued to cause the Tracking Tools, including the aforementioned cookies, to be placed on users' browsers and devices and/or transmitted to third-party entities, together with user data.

54.     Specifically, even after users opted out of the sale or sharing of their personal information and declined all non-essential cookies, Defendant continued to cause cookies to be placed on users' devices and/or transmitted to third parties, resulting in the real-time collection of user data that disclosed Website users' Sensitive Information. This included, without limitation, browsing history, visit history, Website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even after users attempted to protect their privacy by rejecting cookies, Defendant continued to transmit user data to third parties.

55.     Certain aspects of the operation of cookies and Tracking Tools on the Website can be observed using website developer tools that log network traffic transmitted to and from a user's device while interacting with the Website.

56.     Network traffic logs generated through such tools reveal HTTP requests and transmissions between users' browsers and multiple third-party domains while users visit and interact with the Website.



*Figure 11 – Screen capture as of Dec. 30, 2025, depicting the Developer Tool on user's browser to record and capture network activity*

57.     These network logs demonstrate that, even after users rejected non-essential cookies and opted out of the sale or sharing of their personal information, users' browsers continued to make numerous GET and POST HTTP requests to third-party domains, and otherwise used non-essential cookies to track users.

58.     As of December 31, 2025, the cookie banner now appears to be operational. Plaintiff cannot determine whether this condition reflects a permanent remediation, a temporary modification, or a browser-specific configuration. Any subsequent change does not cure

Defendant's prior violations and does not affect Defendant's liability for the conduct alleged herein.

59.     Through these ongoing transmissions, Website users' Sensitive Information, including browsing history, visit history, interactions, inputs, session data, identifiers, and device-level information were surreptitiously disclosed to third parties. These Tracking Entities and Tracking Tools enable third parties to track users across websites and over time, correlate user behavior with other datasets, and compile detailed user profiles reflecting users' preferences, behaviors, demographics, and inferred characteristics. These profiles are monetized for advertising, analytics, and marketing purposes.

60.     The third-party code that Defendant caused to be loaded and executed by users' browsers functions as an unlawful wiretap when it is executed because it enables Tracking Entities that are separate and distinct from the parties to the communications to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. These third parties are not mere passive tools or instruments of Defendant; they independently collect and use the intercepted communications for their own commercial purposes, in addition to providing benefits to Defendant.

## IV.    Defendant's Website Uses Tracking Tools To Spy on Users.

61.     Defendant operates the Website and has installed on the Website software created by third-party social media companies. These Tracking Tools operate invisibly, tracking Defendant's site visitors' activity surreptitiously.

62.     Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant, like adding a product to the shopping cart, are triggered. Parameters

added to events by Defendant determine just how much data is collected, and how specific that data is.

63.     Parameters are strings of text that website owners add to a URL to track and organize their webpages.[18] URL parameters include key-value pairs formatted as "key=value":

    a.  The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

    b.  The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 12 - Diagram of a URL displaying how parameters function*[19]

**A.     The TikTok Pixel**

64.     TikTok offers software – known as a "tracking pixel" – to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

---

[18] *URL Parameters: What They Are and How to Use Them Properly*, Bᴀᴄᴋʟɪɴᴋᴏ (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Dec. 22, 2025).
[19] *Id.*

65.     The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website, before any pop-up or cookie banner advises them of the invasion or seeks their consent. To use the TikTok Pixel, the website operators must include the specific pixel IDs associated with their websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.[20]

66.     Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in *Figures 15* and *17*—the TikTok javascript code in *Figure 15* references Defendant's Pixel ID, whereas the "code" variable in *Figure 17* identifies the TikTok Pixel ID, both of which reference the Pixel ID as "COQK01RC77UF8F9D7H8G".

67.     TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword loads onto a user's browser), the value of the purchase, and the product purchased.[21]

68.     These event triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

69.     The TikTok Pixel also collects:

   a.   The time website actions took place;

   b.   The IP address (which is used to determine the geographic location of a user);

   c.   Device information, including make, model, operating system, and browser information);

---

[20] *See generally Troubleshoot with Pixel Helper*, TɪᴋTᴏᴋ, *https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en* (last visited Dec. 22, 2025) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).
[21] *How to Set Up Events and Parameters with Events Builder*, TɪᴋTᴏᴋ, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Dec. 22, 2025) (describing how to designate events).

     d.   Cookies that can be used to identify users; and

     e.   Metadata and button clicks.[22]

70.    The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are and how they navigate around the Website.

71.    TikTok's "Advanced Matching" features allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[23] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[24] TikTok then provides Defendant with custom audiences based on website visitor events, like page views or purchases, to model lookalike audiences.[25] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[26]

72.    Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.[27]

---

[22] *About TikTok Pixel*, TikTok, https://ads.tiktok.com/help/article/tiktok-pixel (Dec. 22 2025).

[23] *About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Dec. 22, 2025).

[24] *How to set up Automatic Advanced Matching*, TikTok, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Dec. 22, 2025).

[25] *Get started with the TikTok Pixel: a small business guide*, TikTok (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Dec. 22, 2025) (benefits of using the TikTok Pixel).

[26] *See How to use TikTok Pixel: TikTok conversions tracking*, LeadsBridge (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Dec. 22, 2025).

[27] *Id.*

73.     Defendant used the TikTok Pixel to monitor and log, in real time, when users clicked on specific products, loaded webpages, add specific products to cart, and proceed through the checkout process to payment and shipping.

74.     The TikTok Pixel also captures users' identifying cookies (the _fbp cookie[28] is used to identify Facebook and non-Facebook users, the _ttp and tta_attr_id_mirror cookies are used to identify TikTok users[29]), and hashed email, which can still be de-anonymized through the use of a tool called a "reverse lookup table."[30]

75.     Plaintiff had a reasonable expectation that: (i) Plaintiff's identifying information, (ii) information that designated Plaintiff as interested in purchasing or otherwise as a purchaser of the Defendant's products, and (iii) IP address and identifier information relating to who Plaintiff was and who Plaintiff was communicating with to obtain the products would not be exposed to the Tracking Tools placed by Defendant.

76.     Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[31]

---

[28] *See* Cookies Policy, FACEBOOK, https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.7 (noting the use of _fbp cookie to track users regardless of their status as FB users) (last visited Dec. 22, 2025)
[29] *See List of Cookies,* G-STAR RAW, https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is, measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Dec. 22, 2025)
[30] *Can someone please explain reverse look up tables?*, SOFTWARE ENGINEERING, https://softwareengineering.stackexchange.com/questions/277152/can-someone-please-explain-reverse-look-up-tables (last visited Dec. 22, 2025)
[31] *See Benefits of using the TikTok Pixel*, TIKTOK, (Sept. 6, 2025) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Dec. 22, 2025).

77.     TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services and to generate its own benchmarking reports to share with other TikTok business customers.[32]

78.     According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[33] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[34]

79.     An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:



*Figure 13 – Screen capture as of Dec. 30, 2025, depicting the Home page of Website*

---

[32] *TikTok Business Products (Data) Terms*, TikTok (July 29, 2024),
http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 22, 2025).
[33]     *See Aaron Katersky*, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC News (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Dec. 22, 2025).
[34] *Id.*



*Figure 14 – Using a browser's "developer tools" on a Popeyes's webpage shows the Website loading TikTok Pixel's code onto the user's browser*

```
1   window[window["TiktokAnalyticsObject"]]._env = {
      "env": "external",
      "key": ""
    };
3   window[window["TiktokAnalyticsObject"]]._variation_id = 'default';
    window[window["TiktokAnalyticsObject"]]._vids = '';
    window[window["TiktokAnalyticsObject"]]._cc = 'US';
    window[window.TiktokAnalyticsObject]._li || (window[window.TiktokAnalyticsObject]._li =
    window[window.TiktokAnalyticsObject]._li["COQK01RC77UF8F9D7H8G"] = "3e10d816-ea5e-11f0-9
    window[window["TiktokAnalyticsObject"]]._cde = 390;
    ;if (!window[window["TiktokAnalyticsObject"]]._server_unique_id)
       window[window["TiktokAnalyticsObject"]]._server_unique_id = '3e10e70c-ea5e-11f0-9a16
    window[window["TiktokAnalyticsObject"]]._plugins = {
      "AdvancedMatching": true,
      "AutoAdvancedMatching": true,
      "AutoClick": true,
      "AutoConfig": true,
      "Callback": true,
      "DiagnosticsConsole": true,
      "EnableLPV": true,
      "EnrichIpv6": false,
      "EnrichIpv6V2": false,
      "EventBuilder": true,
      "EventBuilderRuleEngine": false,
      "HistoryObserver": true,
      "Identify": true,
      "JSBridge": false,
      "Metadata": true,
      "Monitor": false,
      "PageData": true,
      "PerformanceInteraction": false,
      "RuntimeMeasurement": false,
      "Shopify": true,
      "WebFL": false
    };
    window[window["TiktokAnalyticsObject"]]._csid_config = {
      "enable": true
```

*Figure 15 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

80.     The Website instantly sends communications to TikTok when a user views the page and tracks page interactions. In the screenshots below, the sample webpage being viewed is depicted, along with the webpage code showing the various TikTok scripts being run by Defendant, and the electronic impulses being sent to TikTok to add to their collection of user behavior:



*Figure 16 – Screen capture as of January 7, 2026, depicting a Sample product on the Website*

× Headers  Payload  Preview  Response  Initiator  Timing  Cookies

▼ Request Payload    [ View source ]
▼ {event_id: "", message_id: "messageId-1767801148838-4767440099496", is_onsite: false,…}
    event_id: ""
    action: "Click"
  ▶ auto_collected_properties: {page_trigger: "Click", trigger_element: {tag: "IMG", inner_text: "",…}, intent_data: [{,…}]}
  ▼ context: {ad: {sdk_env: "external", jsb_status: 2}, device: {platform: "pc"},…}
    ▼ ad: {sdk_env: "external", jsb_status: 2}
        jsb_status: 2
        sdk_env: "external"
    ▼ device: {platform: "pc"}
        platform: "pc"
      index: 3
    ▼ library: {name: "pixel.js", version: "2.2.1"}
        name: "pixel.js"
        version: "2.2.1"
    ▼ page: {url: "https://www.popeyes.com/", referrer: "", load_progress: "2"}
        load_progress: "2"
        referrer: ""
        url: "https://www.popeyes.com/"
      pageview_id: "d7a24da4-ebe0-11f0-bf32-b83fd2fb1a0e:8CJ_9.1.0::d7a22c22-ebe0-11f0-bf32-b83fd2fb1a0e"
    ▼ pixel: {code: "COQK01RC77UF8F9D7H8G", runtime: "1", codes: "COQK01RC77UF8F9D7H8G"}
        code: "COQK01RC77UF8F9D7H8G"
        codes: "COQK01RC77UF8F9D7H8G"
        runtime: "1"
      session_id: "d7a24da4-ebe0-11f0-bf32-b83fd2fb1a0e::YkWV7OrYQIsjZq65pA5B"
    ▼ sessions: [{csid: "1767800985981::4rExeyckm3Kx6Hf6hpQ7", page_csid: "1767800985981::M0TNQr4MKVjW8mZ_vIkW",…}]
      ▶ 0: {csid: "1767800985981::4rExeyckm3Kx6Hf6hpQ7", page_csid: "1767800985981::M0TNQr4MKVjW8mZ_vIkW",…}
    ▼ user: {anonymous_id: "01KECJCP8V2NCBKAF73VDPFS8K_.tt.1"}
        anonymous_id: "01KECJCP8V2NCBKAF73VDPFS8K_.tt.1"
        userAgent: "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/143.0.0.0 Safari/537.36"
        variation_id: "default"
    event_id: ""
    is_onsite: false
    message_id: "messageId-1767801148838-4767440099496"
    properties: {}
  ▶ signal_diagnostic_labels: {raw_email: {label: "missing"}, raw_auto_email: {label: "missing"}, raw_phone: {label: "missing"},…}
    timestamp: "2026-01-07T15:52:28.838Z"
  ▶ _inspection: {vids: ""}

*Figure 17 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 16*

81.     To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms").

82.     The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[35]

83.     The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[36]

---

[35] *TikTok Business Products (Data) Terms*, TɪᴋTᴏᴋ (July 29, 2024),
https://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 22, 2025).
[36] *Id.*

84.    TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[37] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

85.    TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[38]

86.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel, and ignored TikTok's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their private information.

## B.    The Facebook Pixel

87.    Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

88.    The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Pixel.[39]

---

[37] *Id.*
[38] *Id.*
[39] *Setup and install the Meta Pixel*, FACEBOOK,
https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Dec. 22, 2025).

89.     Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta), is generated.[40] This Pixel ID is used to initialize the Pixel, either by allowing Meta to fetch a pre-determined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[41]

90.     This Pixel ID must match "a known Pixel ID" in Meta's system,[42] and is transmitted by the Meta Pixel.[43]

91.     As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[44]

92.     Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[45] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[46]

93.     The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[47]

---

[40] *Id.*

[41] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Dec. 22, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[42] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Dec. 22, 2025).

[43] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Dec. 22, 2025).

[44] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Dec. 22, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[45] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Dec. 22, 2025).

[46] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Dec. 22, 2025).

[47] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Dec. 22, 2025).

94.     Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

95.     When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[48] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook users.

96.     The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.



*Figure 18 – Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

97.     The FID can simply be appended to www.facebookcom/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 11*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:

---

[48]  *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Dec. 22, 2025).



*Figure 19 – Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

98.     The Pixel tracks user activity on web pages by monitoring events,[49] which when triggered, causes the Pixel to automatically send data – here, users' Sensitive Information – directly to Facebook.[50] Examples of events utilized by websites include a user loading a page with a Pixel installed (the "PageView event");[51] when a user clicks on a designated button or area of a webpage (the "SubscribedButtonClick event"); and when a user adds an item to a cart for purchase (the

---

[49] *About Meta Pixel*, FACEBOOK,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Dec. 22, 2025).
[50] *See generally id.*
[51] *Specifications for Meta Pixel standard events*, FACEBOOK,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Dec. 22, 2025).

"AddToCart event") (collectively the "Meta Events"). The Website utilizes all of these Meta Events.[52]

99.     While the PageView event triggers upon receiving webpage code from the Website, the remaining Meta Events trigger when users attempt to send communications to the Website, such as requesting certain menu items be added to cart, or otherwise requesting to pay for and start the user's order.

100.     Defendant's use of the Pixel also transmits its unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "556497379333589".

101.     Defendant uses the Facebook Pixel to monetize their Website users' Sensitive Information.

102.     Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

103.     Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from *Figure 11*.

---

[52] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Dec. 22, 2025).

*Class Action Complaint*
*Page 35 of 64*



*Figure 20 – Facebook Pixel tracking a user landing on the webpage from Figure 13 through the "PageView" event*

104.    When a business applies with Facebook to use the Facebook Pixel, it is provided

with detail about its functionality, including with respect to private information.[53]

105.    To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool

Terms (the "Facebook Terms").

---

[53] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Dec. 22, 2025) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

106.    The Facebook Terms inform website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[54]

107.    The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[55]

108.    Facebook directs parties implementing the Facebook Pixel—here, Defendant—to encrypt request information[56] *before* data can be shared.[57]

109.    Facebook further provides Facebook Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

110.    Facebook educates or reminds Facebook Pixel users of their responsibility to inform their users of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third party.[58]

111.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel and ignored Facebook's warnings to safely handle its users' data

---

[54] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023),
https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403Ds
PEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Dec. 22, 2025).
[55] *Id.*
[56] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*
[57] *Id.*
[58] *Best practices for privacy and data use for Meta Business Tools*, META,
https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Dec. 22, 2025).

and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### C.    Google Analytics

112.    Google's tracking tools are not implemented into websites by Google but require several affirmative steps on the part of the website owner to implement and to effectuate their data sharing.

113.    Popeyes implements Google Analytics to intercept users' intercepted information.

114.    Like the Facebook Pixel, Google Analytics ("GA") invisibly collects data about user interactions with a website, including link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.

115.    The data collected through GA is sent back to Google, which associates the activity with the website it was collected from. Notably, Google notifies web developers that they should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required." The data collected through GA is sent back to Google, which associates the activity with the website it was collected from.  Notably, Google notifies web developers that they should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."

116.    To use GA the website operators must include the specific Google Tag ID associated with their websites, which allows Google to link the collected data back to their profile on Google products.[59]

117.    Defendant's Google Tag ID is included in transmissions sent to and from users' devices, as seen in *Figure 21*—the HTTP request URL contains the Google Tag ID, listed after "tid=", and referenced as "G-T1ZL0034M1".

118.    In short, the use of GA involves specific data collection practices, pre-configured settings, and known transmission paths for user data. Google acknowledges the legal risks associated with its tracking tools and explicitly shifts the responsibility for informing users and obtaining any required consent onto website operators like Defendant.

119.    Here, Defendant added GA to its Website by (1) creating an Analytics account; (2) designating its Website as a property; (3) adding a data stream to determine what information to collect; and (4) add the GA tag to its website.

120.    Defendant's decision to implement GA into the Website resulted in the interception and redirection of Plaintiff's search terms to Google, as depicted from the example taken directly from the Website below:

---

[59] *About the Google Tag*
https://support.google.com/tagmanager/answer/11994839?hl=en&ref_topic=14595647&sjid=11744702880709055388-NA (Last Accessed on January 7, 2026)



*Figure 21 – Test search made on the Website resulted in Google Analytics intercepting search terms "Spicy Chicken Sandwich" and redirecting them to Google*

121.    After arriving, Google provides analysis and feedback, which helps Defendant monetize the collected information through targeted advertising.

## V.    The Tracking Tools are Pen Registers and/or Trap and Trace Devices.

122.    Florida law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but such information does not include the contents of any communication." FL ST § 934.02(20).

123.    Florida law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but such information does not include the contents of any communication." FL ST § 934.02(21)

124.   The Tracking Tools are processes to record and identify the source of electronic communication by capturing incoming and outgoing electronic impulses and identifying dialing, routing, addressing, and signaling information (the "Routing Information") generated by users, who are never informed that the Website is collaborating with the Tracking Entities to obtain their IP address and other identifying information.

125.   The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, it is designed specifically for that purpose.

126.   Defendant did not obtain Plaintiff's express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

127.   Defendant did not obtain Plaintiff's or Class Members' express or implied consent to be subjected to data collecting and data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

## VI.   Defendant Violated CIPA § 631 by Intercepting the Contents of Plaintiff's Communications

128.   CIPA § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. *Rodriguez v. Ford Motor Company*, 722 F. Supp. 3d 1104, 1113 (S.D. Cal. 2024). Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts. *Id.*

129.   Courts analyze claims under CIPA § 631 using the same framework applied to claims under the federal Wiretap Act. *Brodsky v. Apple Inc*., 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

**A.     Defendant Intercepted the Contents of Communications in Transit**

130.    Under federal and California wiretap law, the "contents" of a communication refer to the intended message conveyed by the communication, not merely record or routing information generated incidentally. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

131.    Transmitted detailed URLs that include both the path of accessed contents and query string containing parameters reflect the substance of a user's communication and therefore constitute contents. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022).

132.    Here, the network requests intercepted by the Tracking Entities included Request URLs containing the names of products users browsed and the step-by-step process of users' purchase activity on the Website.

133.    The Tracking Tools intercepted the contents of Plaintiff's communications contemporaneously with Plaintiff's interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tools loaded onto Plaintiff's browser, and continued to transmit data at the moment Plaintiff received data from and submitted information to the Website.

134.    This interception, duplication, and transmission occurred inside Plaintiff's browser, before the communications reached their intended destination, or the moment the inbound data was loaded, and therefore occurred while the communications were in transit. *See Esparza v. UAG Escondido A1 Inc*., No. 23cv0102 DMS(KSC), 2024 U.S. Dist. LEXIS 24429, at *9 (S.D. Cal. Feb. 12, 2024).

135.    The Tracking Entities were third parties to Plaintiff's communications with Defendant by reading the data in transit.

136.     Defendant's deployment of the Tracking Tools enabled those third parties to intercept Request URLs that specified the content Plaintiff accessed on the Website, in violation of CIPA § 631.

**B.     Defendant Aided and Abetted Third-Party Interceptions**

137.     A party violates CIPA § 631 not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception. "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021).

138.     Defendant knowingly embedded and configured the Tracking Tools in a manner that enabled the Tracking Entities to intercept the contents of Plaintiff's communications with the Website.

139.     Defendant did not obtain Plaintiff's express or implied consent to allow the Tracking Entities to intercept those communications.

140.     Section 631(a) requires the prior consent of all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

**C.     Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Controls**

141.     Plaintiff's investigation revealed that the Website's default settings permitted tracking to begin immediately, before users had any opportunity to review or act upon the cookie banner.

142.     As a result, users were tracked as soon as they landed on the Website home page, without prior consent.

143.     Plaintiff visited the Website while those default tracking settings were active.

144.    Users who visit the Website are shown a cookie banner offering the option to accept only "necessary" cookies."



*Figure 22 – Screen capture as of Dec. 30, 2025, depicting the Cookie Banner shown to users who visit the Website*

145.    Despite those representations, even users who declined all unnecessary cookies on and before December 2, 2025 continued to be tracked by the Meta Pixel.



*Figure 23- The Meta Pixel tracking a user who declined all unnecessary cookies before <u>December 31, 2025</u>*

146.     As confirmed in *Pemberton v. Restaurant Brands International*, representations regarding cookie-consent controls are materially misleading where tracking continues despite users' opt-out selections.

147.     Defendant and the Tracking Entities benefited from the interception of Plaintiff's communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiff's browsing habits and interests, and by using those profiles for targeted advertising.[60]

---

[60] *See About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Dec. 22, 2025); *Meta Pixel*, Facebook, https://www.facebook.com/business/tools/meta-pixel (last visited Dec. 19, 2025); *Enable automatic enhanced match*, Pinterest, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Dec. 22, 2025).

148.     The Tracking Entities independently benefit from the interception of communications by using data collected through the Tracking Tools to improve their own advertising products and to market those capabilities to other businesses.[61]

## CLASS ALLEGATIONS

149.     Plaintiff brings these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Classes (collectively "the Class"):

> All users who visited and interacted with the Defendant's website in the United States during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "Nationwide Class").

> Plaintiff brings this class action individually and on behalf of the following Subclass:

> All users who visited and interacted with the Defendants' website while located in the State of California during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "California Subclass").

150.     Specifically excluded from the Classes are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

---

[61] *See TikTok Business Products (Data) Terms*, TikTok (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 22, 2025); *Meta Business Tools Terms*, Facebook (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403Ds PEkeiKEyrj7rKyf5_t2I8wFEEUZUJII&_rdr (last visited Dec. 22, 2025).

151.   Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

152.   <u>NUMEROSITY</u>: At this time, Plaintiff does not know the number of Class Members but believes the number to be at least fifty, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

153.   <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

      a.   Whether Defendant shared Class Members' personal information with the Tracking Entities or other third parties;

      b.   Whether Defendant obtained effective and informed consent to do so;

      c.   Whether Class Members are entitled to statutory penalties; and

      d.   Whether Class Members are entitled to injunctive relief.

154.   <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

155.   <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

156.   <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of The Federal Wiretap Act 18 U.S.C. § 2510, et seq.**
**(On behalf of Plaintiff and All Class Members)**

157.   Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 15 through 148 as though fully set forth herein.

158.   Plaintiff brings this cause of action on behalf of himself and all Class Members.

159.   The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

160.   The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

161.   The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

162.   The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

163.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

164.    The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

165.    Defendant is a "person" within the meaning of the Wiretap Act.

166.    The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

167.    Plaintiff had a reasonable expectation of privacy in his electronic communications with Defendant's Website, including his searches, browsing activity, and order-related interactions, particularly where Defendant represented through its cookie banner, cookie-preference interface, and Privacy Policy that users could opt out of the sale/sharing of personal information and decline non-essential Tracking Tools.

168.    The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on a commercial website, such as searches, menu selections, and order interactions, are sensitive and convey the substance and meaning of the communication.

169.    A reasonable user is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated illegally as a matter of course.

170.     Plaintiff reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of his electronic communications with Defendant's Website.

171.     Within the relevant time period, Plaintiff's electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiff's consent, for the unlawful purpose of monetizing Plaintiff's intercepted information, including for combining that information with information collected about Plaintiff from across the internet and used for advertising, analytics, and marketing optimization.

172.     Interception occurred whenever Plaintiff interacted with the Website, including when he navigated webpages, used search or location features, viewed menu items, initiated an order, or otherwise communicated information to the Website through his browser.

173.     At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

174.     Plaintiff was never asked to consent to the interception, recording, disclosure, or use of his electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiff affirmatively declined non-essential tracking through Defendant's cookie-preference interface.

175.     The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

176.     As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

    a.  damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or

    b.  statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

    c.  reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
**Invasion of Privacy**
**California Common Law**
**(On behalf of Plaintiff and the California Subclass)**

177.     Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 15 through 148 as though fully set forth herein.

178.     Plaintiff brings this cause of action on behalf of himself and all Class Members.

179.     Under Common law, an invasion of privacy claim requires a legally protected privacy interest, a reasonable expectation of privacy under the circumstances, and conduct constituting a serious invasion of privacy.

180.     Defendant has intruded upon the legally protected privacy interests of Plaintiff and the Class by, among other things, permitting third-party tracking technologies to collect, track, and compile users' Sensitive Information while representing to users that they could opt out of such collection.

181.     Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances. Defendant affirmatively represented in the cookie banner and cookie preferences that users could opt out of the sale/sharing of personal information and decline non-essential cookies. Relying on those representations, Plaintiff and Class Members exercised the Website's

opt-out controls, reasonably expecting that Defendant would honor those choices and would not permit third parties to access their Sensitive Information.

182.   The categories of information collected by the Tracking Entities browsing history, visit history, website interactions, form inputs, device information, session data, user identifiers, geolocation information, and the like constitute "personal information" under California law. See Cal. Civ. Code § 1798.140.

183.   Despite Plaintiff's and Class Members' opt-outs, Defendant permitted third parties to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The third parties used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

184.   Defendant lacked any legitimate business justification for permitting the placement and transmission of the third-party cookies and Tracking Tools that allowed third parties to access, intercept, and collect users' Sensitive Information notwithstanding users' express opt-outs.

185.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

186.   Plaintiff and Class Members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracing.

### THIRD CAUSE OF ACTION
### Intrusion Upon Seclusion
### (On behalf of Plaintiff and All Class Members)

187.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 15 through 148 as though fully set forth herein.

188.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

189.    The tort of intrusion upon seclusion requires (a) an intentional intrusion into a place, conversation, or matter as to which the plaintiff had a reasonable expectation of privacy, and (b) that the intrusion be highly offensive to a reasonable person.

190.    By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to third parties despite users' opt-outs, Defendant intentionally intruded upon the solitude and seclusion of Plaintiff and Class Members.

191.    Plaintiff and Class Members had an objectively reasonable expectation of privacy in their Sensitive Information with the Website because Defendant represented that users could opt out of the sale/sharing of their personal information and opt out of non-essential cookies and Tracking Tools, and because California law protects such communications.

192.    Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking was highly offensive to a reasonable person.

193.    As a direct and proximate result of Defendant's intentional intrusion, Plaintiff and Class Members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

## FOURTH CAUSE OF ACTION
### Violation of the California Invasion of Privacy Act
### Cal. Penal Code § 631
### (On behalf of Plaintiff and the California Subclass)

194.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 15 through 148 as though fully set forth herein.

195.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

196.    CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

197.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

198.    The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

199.    In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication.  Ribas v. Clark, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

200.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

201.    Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and Class Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools, was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

202.    Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

203.    Plaintiff and Class Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

**FIFTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 638.51**
**(On behalf of Plaintiff and the California Subclass)**

204.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 15 through 148 as though fully set forth herein.

205.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

206.    California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, et seq.

207.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." California Penal Code § 638.50(b).

208.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."   California Penal Code § 638.50(c).

209.    "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Koc ava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

210.    California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a).

211.    No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying the Tracking Tools on its Website, because the Tracking Tools are designed

to capture the phone number, email, routing, addressing, and other signaling information of website visitors. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

212.    Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiff's and Class Members' activity on the Website.

213.    Defendant did not obtain consent from Plaintiff and Class Members before using pen register or trap and trace technology to identify users of its Website, and have violated Section 638.51.

214.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of § 638.51.

**<u>SIXTH CAUSE OF ACTION</u>**
**Violation of the Florida Security of Communications Act**
**Fla. Stat. § 934.01, et seq.**
**(On behalf of Plaintiff and All Class Members)**

215.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 15 through 148 as though fully set forth herein.

216.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

217.    The Florida Security of Communications Act ("FSCA") is codified at Florida Statutes, § 934.01, et seq. The FSCA begins with legislative findings, including "On the basis of its own investigations and of published studies, the Legislature makes the following findings...(4) to safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court."

218.    Florida Statutes § 934.10 provides, in pertinent part, as follows "Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred."

219.    The FSCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

220.    The FSCA determines the location of the interception of a communication based on ". . . where the communication originates [from]." *State v. Mozo*, 655 So. 2d 1115, 1117 (Fla. 1995).

221.    Communications sent by Defendant's Website to users, including Plaintiff, automatically caused users' browsers to send users' Sensitive Information to the Tracking Entities.

222.    At all relevant times, Defendant procured the service of, aided, employed, agreed with, and conspired with Tracking Entities to intercept and use Plaintiff's and Class Members' electronic communications while they accessed and interacted with Defendant's Website.

223.    The intercepted and used electronic communications included the substance, import, and meaning of Plaintiff's and Class Members' communications with Defendant's Website, including, without limitation, the URLs visited, menu items viewed, searches performed, selections made, form inputs, order-related interactions, and associated device and session identifiers. This information reflects users' choices, intent, and behavior and constitutes the contents of electronic communications under the FSCA.

224.    Plaintiff and Class Members had a reasonable expectation of privacy in their electronic communications with Defendant's Website, particularly where Defendant represented through its cookie banner, cookie-preference interface, and Privacy Policy that users could opt out of the sale/sharing of their personal information and decline non-essential Tracking Tools.

225.    Notwithstanding those representations and users' affirmative opt-outs, Defendant intentionally caused Tracking Tools to be embedded and executed on the Website in a manner that recorded and transmitted the contents of Plaintiff's and Class Members' electronic communications to the Tracking Entities contemporaneously with the communications and without users' knowledge or consent.

226.    Defendant willingly facilitated the interception and collection of Plaintiff's and Class Members' communications by embedding and enabling Tracking Tools on its Website and configuring those tools to transmit data to third-party servers in real time.

227.    Defendant used the following items as devices or apparatuses to intercept wire, electronic, or oral communications made by Plaintiff and other Class Members:

    a.    The Website's source code, which contained Tracking Tools that recorded and disseminated the contents of users' communications as they interacted with the Website;

b. Plaintiff's and Class Members' web browsers, which were commandeered and manipulated by the Website's code to transmit communications to Tracking Entities;

c. Plaintiff's and Class Members' computing and mobile devices;

d. Third-Party Web and advertising servers, which received and processed intercepted communications for the Tracking Entities; and

e. Server-to-server communications between Defendant and the Tracking Entities that enabled dissemination of users' communications independent of user-initiated disclosures.

228. Defendant failed to adequately disclose the nature, scope, and real-time operation of the Tracking Tools that automatically transmitted the contents of Plaintiff's and Class Members' communications to third parties for advertising, analytics, and marketing purposes.

229. To avoid liability under the FSCA, a defendant must establish the consent of all parties to the communication. Defendant did not obtain Plaintiff's or Class Members' prior, knowing, and voluntary consent to the interception, disclosure, or use of their electronic communications.

230. By aiding and permitting the Tracking Entities to receive Plaintiff's and Class Members' online communications in real time through the Website without consent or judicial authorization, Defendant violated the FSCA.

231. Defendant's interception and disclosure of Plaintiff's and Class Members' electronic communications violated their statutorily protected privacy rights under Florida law.

232. As a result of Defendant's violations of the FSCA, and pursuant to Fla. Stat. § 934.10, Plaintiff and Class Members are entitled to actual damages or, in the alternative, liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater.

233.    Plaintiff and Class Members are further entitled to injunctive and declaratory relief, punitive damages in an amount sufficient to deter similar misconduct, and reasonable attorneys' fees and litigation costs as provided by Fla. Stat. § 934.10.

## SEVENTH CAUSE OF ACTION
### Common Law Fraud, Deceit and/or Misrepresentation
### (On behalf of Plaintiff and All Class Members)

234.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 15 through 148 as though fully set forth herein.

235.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

236.    Defendant made affirmative representations to users through its cookie banner, cookie preferences interface, and related disclosures that users could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

237.    Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

238.    Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

239.    These representations were false and misleading. After users, including Plaintiff, exercised their opt-out choices and declined non-essential cookies, Defendant continued to deploy Tracking Tools and continued to transmit user data to third parties.

240.    Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and

configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

241.    Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

242.    Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

243.    Plaintiff and Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

244.    Plaintiff's reliance was reasonable because Defendant presented the cookie banner and cookie preferences interface as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

245.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

246.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

247.     Plaintiff and Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## EIGHTH CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiff and All Class Members)

248.     Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 15 through 148 as though fully set forth herein.

249.     Plaintiff brings this cause of action on behalf of himself and all Class Members.

250.     Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

251.     Defendant's retention of those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent is unjust.

252.     Plaintiff and Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief against Defendant:

    a.   For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Classes and their counsel as Class Counsel;

b.  For an order declaring the Defendants' conduct violates the statutes reference herein;

c.  For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d.  Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendants to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

e.  An award of statutory damages or penalties to the extent available;

f.  For damages in amounts to be determined by the Court and/or jury;

g.  For pre-judgment interest on all amounts awarded;

h.  For an order of restitution and all other forms of monetary relief;

i.  Reasonable attorneys' fees and costs; and

j.  Such other and further relief as the Court deems necessary and appropriate.

Dated: January 8, 2026

Respectfully submitted,

**RENNERT VOGEL MANDLER &
RODRIGUEZ, P.A.**
Miami Tower, Suite 2900
100 S.E. Second Street
 Miami, Florida 33131
Telephone (305) 577-4177
servicedanielmaland@rvmrlaw.com

*/s/ Daniel S. Maland*
Daniel S. Maland, Esq.
Florida Bar No. 114932
dmaland@rvmrlaw.com

Mark S. Reich*
Gary Ishimoto*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street
27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com

*Counsel for Plaintiff and the Proposed Class*

*pro hac vice* forthcoming